**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Lee Ann McKay, | |
| Plaintiff, | Case No. 21 CV 00577 |
| v. | Honorable Nancy L. Maldonado |
| City of Chicago, et. al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Pro se Plaintiff Lee Ann McKay brings this action against the City of Chicago ("the City"), Barry Garr, Caruso Lockett, Stephen Little, Michael Carbone, Brian Helmold (collectively, the "Individual Defendants") and the Retirement Board of the Fireman's Annuity and Benefit Fund of the City of Chicago (the "Board"). McKay alleges sex discrimination, race and national origin discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. McKay also alleges constitutional claims for violation of her Fourth Amendment rights pursuant to 42 U.S.C. § 1983. Finally, McKay alleges state law claims for intentional infliction of emotional distress ("IIED") and intrusion upon seclusion. The City and the Individual Defendants have moved to dismiss McKay's operative Second Amended Complaint ("SAC") in its entirety. The Board has separately moved to dismiss McKay's constitutional and state law claims against it.

For the reasons stated in this Opinion, the City and the Individual Defendants' motion to dismiss, (Dkt. 61), is granted in part and denied in part. McKay's Title VII retaliation claim against the City may proceed. McKay's Title VII sex, race, and national origin discrimination claims, § 1983 claims against the City, IIED, and intrusion upon seclusion claims are dismissed without

prejudice. McKay's § 1983 individual capacity and conspiracy claims against the Individual Defendants are dismissed with prejudice. Additionally, the City's motion to strike McKay's prayer for punitive damages for her Title VII claim against the City is granted. The Board's motion to dismiss, (Dkt. 64), is granted, and all of McKay's claims against the Board are dismissed with prejudice. By August 5, 2024, the parties should submit a joint status report, proposing a case management schedule. McKay has until July 29, 2024 to amend her SAC for a third time.

### Background

The operative SAC, (Dkt. 60),[1] alleges the following facts, which the Court accepts as true for the purpose of considering the instant motions to dismiss. *See Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). Plaintiff Lee Ann McKay is an Engineer/EMT to the 1st District of the Chicago Fire Department ("CFD"). (Dkt. 60 at 6, 131.)[2] McKay has worked at the CFD since 1999. (*Id.* at 6.) At the time of the relevant events, Barry Garr was the Assistant Deputy Fire Commissioner, Caruso Lockett was a Lieutenant, Stephen Little was a Battalion Chief, Michael Carbone was a Deputy District Chief, and Brian Helmold was the Deputy Fire Commissioner at the CFD. (*Id.* at 7–8.) McKay sues all Individual Defendants in their individual capacities. (*Id.*)

The Board oversees a retirement fund that was organized under the Illinois Pension Code for the benefit of CFD employees and their families. (*Id.* at 6, 45–46.) The Board consists of eight Trustees, which includes the City Treasurer, the City Comptroller, the City Clerk, a Deputy Fire Commissioner designated by the Fire Commissioner, three elected active firefighters and/or paramedics who participate in the fund, and one retired firefighter and/or paramedic who

---

[1] On March 1, 2022, Judge Kocoras granted the initial defendants' (the City, Garr, Little, and Lockett's) motion to dismiss McKay's initial complaint without prejudice. (Dkt. 30.) McKay was granted leave to file an amended complaint, which she did, bringing claims against the City, the Individual Defendants, and the Board. (Dkt. 31.) After the City and the Individual Defendants and the Board filed separate motions to dismiss McKay's first amended complaint, the Court granted McKay's motion for leave to amend her complaint again. (Dkt. 58.) McKay proceeded to file the operative SAC on July 14, 2022.

[2] Page numbers are taken from CM/ECF headers.

participates in the fund. (*Id.* at 45.) Among other responsibilities, the Board is responsible for administering the retirement fund and authorizing payments of any annuity, pension, or benefit granted under the Illinois Pension Code. (*Id.* at 46.)

## I.     McKay's general allegations regarding discrimination and retaliation by the CFD

McKay has filed several charges of discrimination against the CFD with the Equal Employment Opportunity Commission ("EEOC"). (*Id* at 9.) On February 29, 2016, McKay filed a charge of discrimination alleging that she and other female employees are subjected to different employment terms and conditions. (*Id.* at 115.) In her charge of discrimination, McKay alleged that "[m]any firehouses do not have separate Facilities for men and women, and at others, the Facilities for women are unequal or not equally accessible to those available to the men. The disparities in the facilities also discourage other women from applying to work as City of Chicago firefighters and paramedics." (*Id.*)

On February 13, 2017, McKay filed another charge with the EEOC complaining of retaliation by the CFD for filing her February 2016 charge of discrimination. (*Id.* at 118.) Specifically, McKay alleges that the CFD in retaliation: did not properly and timely pay her overtime; assigned someone to her shift to spy on her and harass her; enlisted that same person to file a spurious report against her; had this same person direct traffic in a dangerous manner while McKay was driving an engine; moved her to a less desirable firehouse; repeatedly summoned her to the district and headquarters for investigations, which disrupted her work schedule; removed the bed and mattress from the women's quarters at Engine 1[3]; created a hostile work environment "with respect to signage and the use of washrooms"; failed to follow official protocol to investigate her internal complaints; and in general, fostered a hostile work environment. (*Id.*) In addition to

---

[3] It is not clear from the SAC whether Engine 1 refers to the 1st District and if Engine 1 is where McKay works.

the allegations of retaliation contained in her February 2017 EEOC charge, McKay further alleges that, since 2017, she has been further investigated and disciplined by the CFD, that her property has gone missing, that her decision-making ability has been restricted, that she has been denied training, and that she has been harassed and intimidated. (*Id.* at 13–14.)

Finally, on July 5, 2017, McKay filed a third EEOC charge against the CFD alleging race and national origin discrimination. (*Id.* at 121.) In her charge of discrimination, McKay, who does not specify her race or national origin, alleges that the CFD shows preferential treatment to "Hispanics and Blacks . . . in reference to promotions." (*Id.*) More specifically, she alleges that she took the promotion exam for Lieutenant in 2009, that she was placed as number 406 on the list, and that she was not made Lieutenant until April 2017. (*Id.*) In between that time, the exam to make Captain was offered in January 2017. (*Id.*) In order to become Captain, a CFD employee must first be a Lieutenant. (*Id.*) At the time the Captain's exam was offered, McKay "was 19 out for promotion to Lieutenant." (*Id.*) McKay alleges that because "non-Hispanic and no[n]-Black females are not getting promoted timely," they are prevented from taking promotion exams. (*Id.*)

## II. McKay's allegations based on her allegedly wrongful drug test

In addition to her general allegations of discrimination and retaliation, McKay alleges that the CFD subjected her to a wrongful drug test in an effort to retaliate against her for her charges of discrimination and lawsuit against the City. (*Id.* at 16.) The drug test incident began after McKay got wet repairing a leak in a line on Engine 42, received no help while refilling the Engine's reservoir tank, and was locked out of the firehouse. (*Id.* at 19–23.)

During a subsequent emergency run, Lieutenant Lockett and McKay were driving together when Lockett turned off the defrosters. (*Id.* at 23.) McKay, in response, said, "leave the heat alone I am f***ing cold." (*Id.*) McKay emphasized that she was wet from having to fix the Engine leak

and refill the tank and reminded Lockett that no one from the firehouse had helped McKay. (*Id.*) Lockett informed McKay that she swore at him, but he neither removed McKay from the driver's seat nor put Engine 42 out of service. (*Id.* at 23–24.)

Later that morning, Battalion Chief Little and Lockett called McKay into the office about the interaction between McKay and Lockett. (*Id.* at 24.) McKay alleges that vile language and swearing has long been common in Engine 42's quarters. (*Id.*) During the conversation, McKay became upset and wanting to remove herself from the situation, she requested to "lay up." (*Id.*) McKay was subsequently transported to Northwestern Memorial Hospital per the department policy and Little conducted the CFD required well-being check. (*Id.*) The hospital placed McKay on medical leave ("laid up") until McKay was cleared by the CFD Medical Division. (*Id.* at 25.) McKay alleges that it was evident at the hospital that she was not physically or mentally impaired. (*Id.*)

Deputy District Chief Carbone later arrived at the hospital and asked McKay to describe what happened but denied McKay's requests for a Union representative to be present. (*Id.* at 26.) McKay refused to talk without a Union representative present. This interaction repeated until finally, Carbone asked McKay if she would submit to a drug test, and told her, "No" when she asked if she could refuse. (*Id.*)

Carbone subsequently transported McKay to the Public Safety Headquarters for the drug test. (*Id.*) On the way to the drug testing facility, McKay asked Carbone why she was being drug tested, and he did not respond. (*Id.*) Once she arrived at the drug testing facility, McKay was asked for a urine sample and took a breathalyzer test. (*Id.* at 28–29.) Carbone subsequently relieved McKay of duty. (*Id.* at 29.) McKay did not test positive on either her urinalysis or breathalyzer exams. (*Id.* at 30.) McKay alleges that the drug tests caused her severe emotional distress. (Id. at

37.) The CFD records from the Chief and Deputy District Chief state that McKay was "reportedly acting erratically and verbally abusive" and report that she was referred for drug screening. (*Id.* at 32.)

The following Monday morning, McKay went to the CFD Medical Section where she was informed by Chief Monica Porter that she was laid up. (*Id.* at 30–31.) When McKay responded that she was not laid up but was, in fact, relieved of duty and was on administrative leave, Porter spoke to Deputy Fire Commissioner Helmold and confirmed that McKay was laid up. (*Id.* at 31.) Porter had no paperwork indicating that McKay was relieved of duty. (*Id.*)

Following the drug test, on November 21, 2019, McKay filed another charge of discrimination against the CFD alleging, among other things, retaliation in the form of a drug test. (*Id.* at 39.)

### III. McKay's allegations specific to her claims against the Board

About a year after McKay's drug test, on or about January of 2020, Carbone filed an application for an Occupational Duty Disability. (*Id.* at 46.) On March 15, 2020, McKay, having learned of Carbone's disability application, emailed the Board, and called one of the Trustees to alert them to irregularities with Carbone's disability application, namely the fact that "the dates coincided with the drug testing and filing of the Complaint." (*Id.*) The Board did not follow up with McKay. (*Id.*)

On April 1, 2020, the Board held a hearing to determine whether Carbone qualified for an Occupational Duty Disability and ultimately granted his request. (*Id.*) At the hearing, McKay alleges that the Board's physician was asked a question that has never been asked at any other applicant's disability benefits hearing. (*Id.*) The physician was asked whether "based on your experience, do the standards of the National Fire Protection Act indicate that it is not recommended

that a firefighter with his history of the heart condition and stent placement continue to perform full fire fighting duties?" (*Id.*)

McKay alleges that the Board collaborated with the City "to reward Carbone for his actions and silence in the perpetuation of the retaliation and violation of [McKay's] fourth amendment rights." (*Id.* at 47.) After the Board's hearing on Carbone's disability benefits, McKay amended her November 21, 2019 EEOC charge to include the Board for their alleged role in facilitating the other defendants' wrongful activity. (*Id.*)

McKay initiated this action by filing a complaint against the City, Garr, Little, and Lockett on January 28, 2021. (Dkt. 1.) On July 14, 2022, McKay filed her SAC against the City, the Individual Defendants, and the Board. (Dkt. 60.) The City and the Individual Defendants have moved to dismiss McKay's SAC in its entirety for failure to state a claim. (Dkt. 62.) The Board has separately moved to dismiss McKay's constitutional and state law claims against it for failure to state a claim. (Dkt. 64.)

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pled facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Discussion

The City and the Individual Defendants seek dismissal of McKay's SAC in its entirety on the grounds that McKay has failed to state any claim for relief against them. (Dkt. 62.) Additionally, the City moves to strike McKay's prayer for punitive damages against it in Counts IV–VIII. (Dkt. 62 at 25.) The Board separately seeks to dismiss Counts IV–VIII for failure to state a claim. (Dkt. 64.) The Court will address the two motions to dismiss in turn, beginning with the City and the Individual Defendants' motion.

### I.     The City and Individual Defendants' Motion to Dismiss Counts I–VIII

The City and Individual Defendants move to dismiss McKay's Title VII sex discrimination, retaliation, race and national origin discrimination, § 1983, and state law claims against them. The Court will evaluate their arguments in support of dismissal below.

### a.   Count I – Title VII Sex Discrimination Claim

The Court begins with McKay's Title VII sex discrimination claim. A plaintiff bringing a sex discrimination claim under Title VII must "aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex." *Spencer v. Austin*, No. 19 C 7404, 2021 WL 4448723, at *5 (N.D. Ill. Sept. 28, 2021) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). Although the Title VII pleading standard is an "undemanding" one, the complaint must still "give the defendant sufficient notice to enable him to begin to investigate and prepare a defense." *Id.* (quoting *Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015).

The City contends that McKay has failed to state a Title VII sex discrimination claim because she does not allege that she herself has suffered from an adverse employment action. The City argues that, instead, McKay merely makes generalized comments about the CFD writ large, which is insufficient for pleading a Title VII violation. (Dkt. 62 at 9–10.) In response, McKay points to Exhibits D–G of her SAC and argues that the allegations contained within her EEOC charges of discrimination and her EEOC Determination Letter sufficiently demonstrate that she has experienced adverse employment actions due to her gender. (Dkt. 69 at 2–3.)

The Court, having reviewed each of the attached exhibits, concludes that McKay has failed to state a claim for sex discrimination under Title VII. Although Exhibit D discusses sex discrimination, the allegations contained therein do not appear to be specific to McKay. (Dkt. 60 at 115.) For example, McKay alleges that "[m]any firehouses do not have separate facilities for men and women, and at others, the Facilities for women are unequal or not equally accessible to those available to the men." (*Id.*) McKay, however, does not allege that this is the case at the firehouses where she has worked, nor does she provide any details about treatment she received on the basis of her sex that would give the City sufficient notice on how to investigate her claim. Her statement that "[t]he disparities in the facilities also discourage other women from applying to work as City of Chicago firefighters and paramedics" further suggests that she is complaining of poor employment practices within the CFD that affect women generally, not anything specific to herself. (*Id.*) Notice pleading is a low bar, and McKay does not have to plead minute details, but she must be able to put the City on notice of her claim by identifying the adverse employment action that she herself has faced on the basis of her sex. In other words, McKay must at least broadly describe what discriminatory conduct implicated her personally.

The allegations in McKay's other Exhibits fare no better and provide no meaningful showing of what discriminatory conduct McKay has personally faced on the basis of her sex. There are two allegations in the EEOC charges attached to the SAC that may relate to sex discrimination: McKay alleges that a bed and mattress were removed from the women's quarter at Engine 1 and that a hostile work environment was created "with respect to the signage and use of washrooms." (*Id.*) But removal of a mattress and a bed, without more context, does not constitute an adverse employment action. *See Daniel v. Advoc. Health Care Network*, 278 F. Supp. 3d 1056, 1062 (N.D. Ill. 2017) ("A materially adverse employment action is something 'more disruptive than a mere inconvenience.'") (quoting *Nichols v. S. Illinois Univ.–Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)). Moreover, McKay provides no details about the nature or content of the signage that would allow the Court to reasonably infer that the signs about washrooms created a hostile work environment. The Court emphasizes that McKay does not need to prove her case at the pleading stage, but she must provide some additional information to make her claim plausible if her allegations are not immediately identifiable as adverse employment actions.

Finally, Exhibit G is the EEOC's Determination Letter that the evidence obtained in the investigation of McKay's aft-mentioned charges of discrimination "establishes reasonable cause to believe that Respondent (City) discriminated" against McKay due to her sex. (*Id.* at 124–25.) The Court, however, cannot take the EEOC's finding as a basis alone for allowing McKay's claim to go through when the factual allegations in McKay's SAC are insufficient to state a claim for sex discrimination. The City's motion to dismiss McKay's sex discrimination claim is thus granted.

As McKay may be able to add more factual allegations that demonstrate the sex discrimination that she personally faced, the Court dismisses McKay's sex discrimination claim without prejudice.

### b. Counts II & VI – Title VII Retaliation Claims

The Court will next address McKay's Title VII retaliation claim. McKay alleges that after she filed her charge of discrimination with the EEOC in February 29, 2016, she suffered a number of retaliatory actions from the City. (Dkt. 60 at 11–14 ¶¶ 33–37.) To plead a Title VII retaliation claim, a plaintiff must allege that she engaged in a statutorily protected activity and was consequently subjected to an adverse employment action. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014). Unlike the Title VII discrimination standard, an adverse action for the purposes of a retaliation claim is an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006)). The fact that the Court holds that McKay failed to state a claim for gender discrimination does not preclude her retaliation claim. *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013) ("In order for plaintiff's expression to be protected by section 2000e-3(a), the challenged practice need not actually violate Title VII. Instead, it is sufficient if the plaintiff has a reasonable belief she is challenging conduct in violation of Title VII.") (quoting *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314 (7th Cir. 1989)).

The City's argument in support of dismissal is that McKay's lengthy list of allegedly adverse employment actions are "petty slights and minor annoyances," and that she thus fails to allege that she was subject to an adverse employment action. (Dkt. 62 at 12–13.) McKay cites Exhibits D–G of her SAC again in support of her argument that she has pled an adverse

employment action. (Dkt. 60 at 4.) McKay additionally cites Exhibit B of her SAC, the Office of Inspector General's "Audit of Policies and Practices Related to Discrimination and Sexual Harassment within the Chicago Fire Department," ("OIG Audit") which states that "48% of survey respondents who experienced discrimination or sexual harassment did not report it due to fear of retaliation." (*Id.*) McKay argues that the OIG Audit findings, along with the employment actions she has alleged, demonstrate that her pleadings meet the standard for adverse employment action. (*Id.*)

The Court finds that the OIG Audit fails to provide support for McKay's Title VII retaliation claim. The survey responses are not specific to McKay and the Court thus cannot use the results to infer that McKay herself faced retaliation. Additionally, the standard for determining an adverse action is whether the action itself "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Abebe,* 35 F.4th at 607. The OIG Audit, however, does not answer the question of whether the specific actions taken by the City against McKay—which McKay argues are adverse employment actions—would dissuade a reasonable worker from making or supporting a charge of discrimination.

Nevertheless, the Court finds that McKay has alleged sufficient adverse employment actions for the purposes of pleading a retaliation claim. McKay alleges that she was blocked or denied the opportunity to work in certain battalions or at certain firehouses. (Dkt. 60 at 12). McKay also alleges that in November or December of 2016, "[o]vertime forms were 'lost' through the Chain of Command" and that the CFD failed to properly and timely pay her overtime compensation. (*Id.* at 12, 118.) These allegedly adverse actions implicate McKay's work setting, her job opportunities, and potentially her compensation. The Court thus finds that these actions could plausibly dissuade a reasonable employee not to file a complaint.

McKay's SAC also includes a separate count against the City for Title VII retaliation specifically based on the drug test to which she was subjected. (*Id.* at 39–40.) The Court reads this separate count as another allegation in support of her Title VII retaliation claim. The City argues that this separate count should be dismissed as a drug test is not an adverse action for the purposes of Title VII retaliation, and the drug test did not take place close enough in time to McKay's protected activity for there to be a causal link between them. (Dkt. 62 at 20.)

The Court concludes that McKay's drug test constitutes another basis for her Title VII retaliation claim. Courts have held at the summary judgment stage that a drug test is an adverse action if it "is not performed in a routine fashion following the regular and legitimate practices of the employer but is conducted in a manner that harasses or humiliates employees." *Cortez v. Amazon.com, Inc.*, No. 17-CV-7322, 2020 WL 1445628, at *8 (N.D. Ill. Mar. 25, 2020) (quoting *Stockett v. Muncie Indiana Transit Syst.*, 221 F.3d 997, 1001–02 (7th Cir. 2000)). The Court finds that McKay is essentially alleging that the City conducted the drug test to harass or humiliate her. She argues that the City had no reason to drug test her, that it did so for the sole reason of retaliating against her because she had previously filed complaints and initiated a lawsuit against the City, and that it implied she tested positive for substances to her co-workers. (Dkt. 60 at 13, 16, 130.)

The Court further concludes that McKay has alleged a causal link between McKay's protected activity and the drug test. The City is correct that a "lengthy period between the protected activity and the adverse action generally weakens any inference of retaliation." *Elzeftawy v. Pernix Grp., Inc.*, 477 F. Supp. 3d 734, 772 (N.D. Ill. 2020). Courts, however, do not recognize a bright-line rule in recognition that the relevant time period for establishing a causal link is necessarily dependent on the particular facts and circumstances of each individual case. *Carlson*, 758 F.3d at 829. McKay argues that she had initiated another federal lawsuit against the City, which was

ongoing at that time, and Carbone had learned of McKay's EEOC Charge and federal lawsuit only a year prior. (Dkt. 60 at 16–17; 132–33.) The Court finds these allegations are sufficient to allege a causal connection between McKay's protected activity and the drug test.

Whether McKay can prove these claims after discovery and at summary judgment is a question for another day. At the pleading stage, her allegations are sufficient to state a claim for retaliation in violation of Title VII.

### c.   Count III – Race and National Origin Discrimination Claim

Aside from her sex discrimination claim, McKay also brings a Title VII claim for race and national origin discrimination. McKay argues that the City shows preferential treatment to "Black and Hispanic" personnel and, as a result, she was not promoted to Lieutenant in a timely fashion and was thus precluded from sitting for the Captain's exam. (Dkt. 60 at 121.) The Court understands McKay's SAC as bringing a failure to promote claim. While McKay does not identify her race or national origin, the Court infers that she is neither Black nor Hispanic.

To state a Title VII employment discrimination claim, a plaintiff must show: "(1) she is a member of a protected class, (2) she was subjected to an adverse employment act, and (3) there is a link between those two." *Daniel v. Advoc. Health Care Network*, 278 F. Supp. 3d 1056, 1062 (N.D. Ill. 2017). To bring a failure to promote claim, a "plaintiff must plead that [she] applied for a position, was qualified for it, and that the job went to someone else because of the plaintiff's protected characteristic." *Wilson v. Bd. of Trustees of Cmty. Coll. Dist.*, 508, No. 20 C 4604, 2021 WL 1676601, at *3 (N.D. Ill. Apr. 28, 2021) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)).

The Court finds that McKay falls short in alleging that she was qualified for the position she wanted and that the job went to someone else because of her unidentified race or national

origin. McKay alleges she took the promotion exam for Lieutenant in 2009 and was promoted to Lieutenant in April 2017. (Dkt. 60 at 121.) In between that time, the CFD offered a promotion exam for Captain, which McKay was ineligible to take as she was not yet a Lieutenant. (*Id.*) She further alleges that she was placed as number 406 on the lieutenant promotion list and was 19 out for promotion to Lieutenant when the Captain exam was administered. (*Id.*) As McKay was not yet a Lieutenant at the time of the Captain exam, she was not qualified for a promotion to Captain. It is not reasonable to infer from her allegation that she was "bypassed by 39 Blacks and Hispanics" (presumably for the role of Captain though this is not explicit in her complaint) that the CFD failed to promote her to Captain because of her race or national origin when she was still on the waiting list to become Lieutenant when the Captain exam was offered. (*Id.*) The simple fact that Black and Hispanic CFD employees were promoted before her, without more, does not give rise to a race or national origin discrimination claim if those employees were ahead of her on the waitlist. McKay thus has not stated a failure to promote claim. Accordingly, the City's motion to dismiss McKay's race and national origin discrimination claim is granted though she may seek to replead it if in good faith she believes she can state a claim consistent with this Opinion.

### d. Counts IV & V – § 1983 Claims

The Court will now address McKay's constitutional claims. McKay argues that the City and the Individual Defendants subjected her to a drug test that violated her Fourth and Fourteenth Amendment rights. The Fourth Amendment protects against unreasonable searches and seizures by the government. *Joy v. Penn-Harris-Madison Sch. Corp.*, 212 F.3d 1052, 1058 (7th Cir. 2000). Drug tests (including breathalyzer examinations and urinalyses) are considered searches for the purposes of the Fourth Amendment and, generally, they must be based upon individualized suspicion or wrongdoing to be considered reasonable. *Krieg v. Seybold*, 481 F.3d 512, 517 (7th

Cir. 2007) (citing *Chandler v. Miller*, 520 U.S. 305, 313 (1997)); *Seiser v. City of Chicago*, 762 F.3d 647, 654 (7th Cir. 2014) ("A breathalyzer examination constitutes a search implicating the Fourth Amendment."); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995) ("[S]tate-compelled collection and testing of urine . . . constitutes a 'search' subject to the demands of the Fourth Amendment.").

In the absence of individualized suspicion or wrongdoing, a drug test may still be permissible when it "serves special governmental needs." *Rodriguez v. City of Chicago*, 370 F. Supp. 3d 848, 857 (N.D. Ill. 2019). The Supreme Court has held that such a "special need exists when the government employee subjected to random drug testing holds a 'safety sensitive' position." *Krieg*, 481 F.3d at 517 (citing *Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989)). After determining that a special need exists, "courts should 'balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context.'" *Id.* at 517 (citing *Skinner*, 489 U.S. at 619). Courts consider the following factors: "1) the nature of the privacy interest upon which the search intrudes, 2) the character of the intrusion on the individuals' privacy interest, 3) the nature and immediacy of the governmental concern at issue, and 4) the efficacy of the particular means used to address the problem." *Id.* at 518 (citation omitted).

The Court ultimately concludes that although McKay has sufficiently alleged a Fourth Amendment violation, she fails to allege that she had a "clearly established right" at the time of the alleged constitutional deprivation. Accordingly, the Individual Defendants are entitled to qualified immunity on McKay's Fourth Amendment claim. Further, McKay fails to allege that the City caused her alleged constitutional deprivation pursuant to a widespread practice such that it is

16

liable under *Monell*. Accordingly, McKay's § 1983 claims against the Individual Defendants and the City are dismissed.

### i. Qualified Immunity

The Individual Defendants first argue that they are immune from suit under the doctrine of qualified immunity. (Dkt. 62 at 18.) Under the qualified immunity doctrine, "[s]tate officials with discretionary or policymaking authority . . . are not civilly liable unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person in their position would have been aware." *Rusinowski v. Vill. of Hillside*, 835 F. Supp. 2d 641, 650 (N.D. Ill. 2011). Dismissal of a § 1983 suit on the grounds of qualified immunity on a 12(b)(6) motion is a "delicate matter" because while qualified immunity is a defense to suit and should be addressed as early as possible, under Federal Rule of Civil Procedure 8, a plaintiff need not anticipate a qualified immunity defense and allege facts in his or her complaint to defeat it. *Id.* at 650. Nevertheless, at the pleading stage, dismissal based on a qualified immunity defense is appropriate when the allegations in the complaint fail to state a violation of clearly established law. *See Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020).

The Individual Defendants argue that McKay did not have a "clearly established right" to be free from her employer's warrantless or suspicionless drug test because she occupies a safety-sensitive position. (Dkt. 62 at 19.) (citing *Spring-Weber v. City of Chicago*, No. 16 C 8097, 2017 WL 1316267, at *8 (N.D. Ill. Apr. 10, 2017)). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citing *Reichle v. Howards*, 556 U.S. 658, 664 (2012)). For a right to be clearly established, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. City of Milford*, 10 F.4th 800, 807 (7th Cir.

2021). "[T]he Supreme Court has held that a right is 'clearly established' only if it has been 'defined with specificity.'" *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019). A plaintiff bears the burden of showing that a "constitutional right was clearly established *at the time of the violation.*" *Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023) (emphasis added). A plaintiff can meet this burden by "identify[ing] a reasonably analogous case that articulated the constitutional right at issue and applied it to a similar factual circumstance, or. . . show[ing] that the violation was so obvious that a reasonable official in the defendants' positions necessarily would have recognized that their actions violated the Constitution." *Id.* at 880.

The Court concludes that the Individual Defendants are entitled to qualified immunity as McKay has not demonstrated that she had a clearly established constitutional right to be free from warrantless or suspicionless drug testing by her employer. In support of their argument, the Individual Defendants rely on *Spring-Weber*, which held that subjecting a firefighter to warrantless or suspicionless drug testing "does not violate a clearly established right, given that other circuits have determined that a firefighter qualifies as a safety-sensitive position subject to warrantless drug testing and the absence of contrary authority from the Seventh Circuit." 2017 WL 1316267 at *8 (citing *Wilcher v. City of Wilmington*, 139 F.3d 366, 375 (3d Cir. 1998)). In her opposition, McKay does not dispute that she occupies a safety-sensitive position, and she does not include any caselaw to support that she had a clearly established right based on the facts alleged in her Complaint. She instead reiterates that the Individual Defendants failed to follow the drug testing criteria in the CBA and that any reasonable person would conclude that they knew or should have known the testing criteria. The qualified immunity analysis, however, distinguishes between whether the officials violated a clearly established right and whether that right was clearly established in the first place. *See Holderman v. Walker*, No. 19 C 6324, 2021 WL 1192441, at *16

(N.D. Ill. Mar. 30, 2021) ("[C]ourts may analyze the clearly established prong without first considering whether the alleged constitutional right was violated.") (quoting *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018)). The problem here is that by providing no analogous caselaw, McKay has failed to do the latter. Put differently, even if the Individual Defendants actually violated McKay's constitutional rights, she has not demonstrated that the unlawfulness of their actions was apparent in light of pre-existing law. *See Muhammad v. Pearson*, 900 F.3d 898, 905 (7th Cir. 2018).

McKay's allegations also do not demonstrate that the nature of the Individual Defendants' alleged violation of her Fourth Amendment rights was so patently obvious that any "reasonable official" would have known that he was violating McKay's clearly established constitutional right. *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) ("In some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases, as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated.") (citation omitted).

Accordingly, the Court concludes that qualified immunity is appropriate; McKay's § 1983 individual capacity and conspiracy claims against the Individual Defendants are dismissed. As stated above, a "clearly established right" must be "established at the time of the violation." *Garcia*, 79 F.4th at 880. McKay was unable to produce—and this Court was unable to find— precedent existing at the time of McKay's drug test that clearly established her statutory or constitutional right as a public employee occupying a safety-sensitive position to be free from warrantless or suspicionless drug testing by her employer. The Court therefore dismisses McKay's § 1983 claims against the Individual Defendants with prejudice.

### ii. Monell Liability

Next, the City argues that McKay's § 1983 claim should be dismissed as she has failed to adequately allege *Monell* liability. To hold a local government like the City of Chicago liable for a constitutional deprivation, "[a] plaintiff must allege that the local government itself caused or participated in the deprivation of [her] rights." *Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835, 839 (N.D. Ill. 2020). A local government can be held liable for a violation of § 1983 "through a 'wide-spread' practice that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Id.* (citing *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978)). A plaintiff alleging such a custom or usage "must allege more than a chance slip-up by an individual employee." *Id.* at 840. "Courts in this District regularly dismiss *Monell* claims where the plaintiff has failed to allege instances other than that from which he suffered." *Id.* (quoting *Carmona v. City of Chicago*, No. 15-CV-462, 2018 WL 306664, at *2 (N.D. Ill. 2018) (collecting cases).

Before addressing *Monell* liability, the Court will address two arguments the City makes to refute McKay's assertion that she suffered a constitutional deprivation when she was drug tested. (Dkt. 62 at 13–15.)[4] First, it argues that McKay's union effectively consented to the drug test on her behalf by virtue of the collective bargaining agreement ("CBA") between McKay's union and the CFD. (*Id.* at 14–15; Dkt. 75 at 6–7.) Second, it argues that McKay did not have a reasonable expectation of privacy with respect to her drug test because of her position as a CFD engineer, which they assert is a "safety-sensitive" position. (*Id.* at 14–15.)

With respect to the City's first argument, the Court concludes that the CBA is not dispositive of McKay's § 1983 claim. As a preliminary matter, the Court will consider the CBA

---

[4] The Individual Defendants make these same arguments, and the Court's reasoning below would apply equally to them if they were not qualifiedly immune from civil liability.

attached to the City and the Individual Defendants' motion to dismiss because McKay referenced the CBA in her SAC and, importantly, in support of her argument that her drug test was unreasonable under the Fourth Amendment. (Dkt. 60 at 34); *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice."). The CBA appears to agree to CFD General Order 87–008, which outlines the circumstances in which a CFD employee may be drug tested. (Dkt. 62-1 at 4, 175–180.) The City argues that two provisions of the CBA—and General Order 87–008—justify McKay's drug test: (1) "Duty injury involving lay-up as normal medical/hospital procedure"; (2) "Behavior that would suggest use, excessive use of drugs and/or alcohol, in the opinion of two supervisors." (Dkt. 62 at 15.)

The Court finds that there are too many fact issues to decide at this point in the litigation whether the CBA and General Order 87–008 gave the Individual Defendants the right to drug test McKay. For example, McKay argues that, although she requested a lay-up, there is a distinction between duty- and non-duty layups, with only the former justifying drug tests. (Dkt. 69 at 6–7.) McKay insists that she was on a non-duty medical condition layup as she did not suffer from an injury while on a dispatched run and that CFD General Order 16-006 states, "Not all injuries or illnesses that occur on duty are considered duty-related." (*Id.* at 6, n.11.) In addition, McKay alleges that she was taken to the Public Safety Headquarters, where the CFD is housed, to be drug tested and was thus not drug tested during a duty-layup as a part of "normal medical/hospital procedure." (*Id.* at 7.) Finally, McKay disputes that her behavior was erratic enough to suggest substance use, especially given that swearing is common in her firehouse. (*Id.* at 8; Dkt. 60 at 35.)

21

In addition, the Court is unpersuaded by the City's second argument that McKay did not have a reasonable expectation of privacy in her urine sample or breath. Although the government has a special need for suspicionless drug testing when a plaintiff works in a safety-sensitive position, courts must still balance the relevant governmental and privacy interests. *Spring-Weber*, 2017 WL 1316267, at *5 (N.D. Ill. Apr. 10, 2017). The Court thus declines to find that McKay fails to allege a Fourth Amendment violation solely because she works in a safety-sensitive position.[5]

Nevertheless, the Court finds that McKay fails to allege that the City violated her Fourth Amendment rights pursuant to a widespread practice, as required for *Monell* liability. McKay alleges that the City's "policies, customs, and practices caused the constitutional deprivation by establishing a practice or custom," but her only well-pled factual allegation in support of this contention is her own drug test. McKay not only fails to allege that other employees have been subject to wrongful drug tests, but she also fails to allege that she herself has ever been drug tested at any other time. McKay relies again on the OIG Audit and the EEOC Letter of Determination,

---

[5] The Court distinguishes here between the tasks of (1) deciding whether a plaintiff has demonstrated that she had a "clearly established right" for the purposes of qualified immunity and (2) deciding whether a plaintiff has adequately alleged that a constitutional deprivation occurred for the purposes of establishing *Monell* liability. The "clearly established right" doctrine is meant to ascertain whether the state official was on notice that their actions were unlawful. *See Greene v. Cook Cnty. Sheriff's Off.*, 79 F. Supp. 3d 790 (N.D. Ill. 2015) ("The relevant inquiry in determining whether a right is clearly established is whether a reasonable person in the official's position would have appreciated that her conduct was illegal under the circumstances.") (citation omitted). For that reason, whether or not the state official actually committed the alleged violation is immaterial to an inquiry into whether the right itself was "clearly established." *See Carr v. Jehl*, No. 13 CV 6063, 2015 WL 362089, at *8 (N.D. Ill. Jan. 28, 2015) ("[Qualifed immunity doctrine] gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.") (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). When evaluating a *Monell* claim at the pleading stage, however, the Court must determine whether it is reasonable to infer from plaintiff's allegations, taken as true, that a constitutional deprivation occurred. Consequently, the Court's holding that McKay's right to be free from warrantless or suspicionless drug tests by her employer was not clearly established at the time of the drug test for the purposes of the Individual Defendants' qualified immunity defense does not mean that the City could never be liable for improper drug testing under *Monell*. *See Spring-Weber*, 2017 WL 1316267, at *5, *8 (holding plaintiff stated a *Monell* claim for a Fourth Amendment violation against the City of Chicago but that individual defendants were entitled to qualified immunity as plaintiff's asserted Fourth Amendment right was not "clearly established"). Rather, it means that McKay has not shown that the state of the law placed her asserted right "beyond debate" such that the Individual Defendants would have been on notice that their actions were unlawful under the particular circumstances here.

but these exhibits do not provide the missing factual support necessary for McKay's *Monell* claim to survive. The OIG Audit makes no mention of wrongful drug tests, and as discussed above, the EEOC Letter of Determination cannot stand in place of McKay's missing factual allegations. The City's motion to dismiss McKay's *Monell* claim for her allegedly unlawful drug test is thus granted. In the event McKay can provide additional factual allegations in support of her argument that the City engages in a widespread practice of conducting wrongful drug tests, her *Monell* claim is dismissed without prejudice.

### e.     Count VII – IIED

The Court now turns to McKay's IIED claim. In the SAC, McKay seemingly alleges that the drug test is the basis of her IIED claim, but her response to the City and the Individual Defendants' motion to dismiss mentions other allegations in support of her IIED claim that were pled in connection with her Title VII claim. The Court will thus not restrict its evaluation of whether McKay has stated an IIED claim to the drug test alone.

A plaintiff stating an IIED claim under Illinois law must allege that (1) the defendant's conduct was "truly extreme and outrageous;" (2) the defendant intended or knew that there was "at least a high probability that [their] conduct would cause severe emotional distress;" (3) the defendant's conduct actually caused "severe emotional distress." *Sharma v. Bd. of Trustees of Univ. of Ill.*, 404 F. Supp. 3d 1183, 1205 (N.D. Ill. 2019) (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (2003)). "Courts apply an objective standard to determine whether conduct is extreme and outrageous and may dismiss an IIED claim if the alleged conduct is not sufficiently so." *Id.*

"Conduct is extreme and outrageous where it goes 'beyond all possible bounds of decency, and [is] regarded as intolerable in a civilized community.'" *Id.* (citing *Swearnigen-El v. Cook Cty.*

*Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010)). In employment situations, Illinois state courts are often reluctant to find an IIED claim out of concern that "if everyday job stresses resulting from discipline, personality conflicts, job transfers, or even terminations" were sufficient for an IIED claim, "nearly every employee would have a cause of action." *Id.* (quoting *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 2000)). Moreover, "in the absence of conduct calculated to coerce an employee to do something illegal, courts have generally declined to find an employer's retaliatory conduct sufficiently extreme and outrageous" for an IIED claim. *Id.*, 404 F. Supp. 3d at 1205 (quoting *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. App. Ct. 1999)).

Based on the foregoing, the Court concludes that McKay has not stated a claim for IIED. The Court's review of the entire SAC reveals no allegations that suggest extreme and outrageous conduct. Although the Court held that the loss of her overtime and the change in her responsibilities could be the basis for her Title VII retaliation claim, these actions do not "go beyond all bounds of decency." The same is true for McKay's drug test.[6] Moreover, McKay does not allege that any of the Defendants coerced her into doing something illegal. Instead, McKay's allegations more appropriately fall into the category of "everyday job stresses," which is not to minimize their impact, so much as to clarify that they do not rise to the high bar of "extreme and outrageous conduct." The Court thus grants the City and the Individual Defendants' motion to dismiss McKay's IIED claim. McKay's IIED claim is dismissed without prejudice.

---

[6] In any case, as discussed in the subsequent section, the Court also finds that McKay's IIED claim based on her drug test is time-barred under the Illinois Tort Immunity Act. *See Bailey v. Walsh*, No. 17 C 898, 2017 WL 2404944, at *2 (N.D. Ill. June 2, 2017) (dismissing IIED claim arising from events that occurred during plaintiff's arrest as time-barred under the Illinois Tort Immunity Act because Plaintiff filed claim two years after arrest occurred).

### f.  Count VIII – Intrusion upon Seclusion Claim.

Lastly, the Court will determine whether McKay states a claim for intrusion upon seclusion. The City and Individual Defendants argue that McKay's intrusion upon seclusion claim is time-barred under the Illinois Tort Immunity Act, 745 ILCS 10/8-101. A statute of limitations defense is an affirmative defense, and plaintiffs are therefore generally not required to anticipate statute of limitation arguments. *See Mckissick v. City of Chicago*, No. 22 C 5392, 2024 WL 325338, at *2 (N.D. Ill. Jan. 29, 2024). But where it is clear from the face of the plaintiff's complaint that the claim is not viable under the statute of limitations, a court may dismiss a plaintiff's claim for lack of timeliness. *Chi. Bldg. Design, P.C. v. Mongolian House, Inc*., 770 F.3d 610, 613–14 (7th Cir. 2014) (holding that courts should only dismiss based on a statute of limitations defense "where the allegations of the complaint itself set forth everything necessary").

The Court concludes that the Illinois Tort Immunity Act bars McKay's intrusion upon seclusion claim. Under the Illinois Tort Immunity Act, civil actions commenced against local entities or employees of a local entity "must be commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8–101. McKay alleges that she was subjected to the drug test on February 2, 2019, and she initiated this action on January 28, 2021. (Dkt. 60 at 16; Dkt. 1.) McKay's allegations thus "set forth everything necessary" for the Court to determine that the Illinois Tort Immunity Act should apply here.

McKay's sole argument in response to the argument that her intrusion upon seclusion claim is time-barred is that she suffers from a continuing violation. (Dkt. 69 at 14.) The Court disagrees. Under the continuing violation doctrine, "where the tort involves continuous or repeated injurious behavior, by the same actor and of a similar nature, the limitations period is held in abeyance and the plaintiff's cause of action does not accrue until the date the final injury occurs or the tortuous

25

acts cease." *Taylor v. Bd. of Educ. of City of Chi.*, 10 N.E.3d 383, 395 (Ill. App. Ct. 2014) (citing

*Feltmeier,* 798 N.E.2d at 85; *Pavlik v. Kornhaber,* 761 N.E.2d 175, 186–87 (Ill. App. Ct. 2001)).

McKay alleges no other intrusions upon her privacy occurred aside from the February 2, 2019 drug

test and thus, the Court finds the continuing violation doctrine is inapplicable here. The City and

Individual Defendants' motion to dismiss McKay's intrusion upon seclusion claim is granted.

## II.     The City's motion to strike punitive damages.

One final matter requires the Court's attention with respect to the City's' motion to dismiss.

Aside from arguing that McKay's claims against it should be dismissed, the City moves to strike

McKay's request for punitive damages from Counts IV–VIII of her SAC. (Dkt. 52 at 25.) As the

Court has already found that McKay has failed to state a § 1983 claim or state law claim against

the City, the Court will only address whether it should strike McKay's request for punitive

damages against the City for her Title VII claim.

The Court grants the City's request to strike McKay's request for punitive damages for her

Title VII claim. Punitive damages are not available under Title VII against a municipality or

government. *Donald v. City of Chicago*, 539 F. Supp. 3d 912, 922 (N.D. Ill. 2021) (striking prayer

for punitive damages) (citing *Passananti v. Cook County*, 689 F.3d 655, 677 (7th Cir. 2012)

("[U]nder Title VII, . . .[a government, government agency or political subdivision] cannot be held

liable for punitive damages."); *Sommerfield v. City of Chicago*, No. 08 C 3025, 2013 WL 4047606,

at *15 (N.D. Ill. Aug. 9, 2013), *aff'd*, 863 F.3d 645 (7th Cir. 2017) ("As a municipality, the City

could not be held liable . . . for punitive damages under Title VII."); *Walker-Dabner v. Dart*, No.

15-CV-942, 2015 WL 9259883, at *6 (N.D. Ill. Dec. 18, 2015) (granting defendants' motion to

strike plaintiff's prayer for punitive damages). Further, in her response to the City's motion to

strike, McKay only responded to the City's argument that punitive damages are not available for

§ 1983 claims and thus effectively conceded the Title VII punitive damages argument. (Dkt. 69 at 15); *Bolden v. Amtrak*, No. 21-CV-2068, 2021 WL 6104827, at *1 (C.D. Ill. May 24, 2021) (collecting cases). If McKay amends her SAC and adds allegations against the City that make her § 1983 claim plausible, the Court will revisit the issue of whether she should be allowed to maintain her prayer for punitive damages in connection with her § 1983 claim against the City.

In summary, McKay's Title VII retaliation claim against the City may proceed. McKay's Title VII sex, race, and national origin discrimination claims, § 1983 claim against the City, and state law claims are all dismissed without prejudice. Her § 1983 individual liability and conspiracy claims against the Individual Defendants are dismissed with prejudice. Finally, her prayer for punitive damages for her Title VII claim is stricken.

### III.    The Board's motion to dismiss Counts IV–VIII.

The Board filed a separate motion to dismiss Counts IV–VII of McKay's SAC, arguing that McKay failed to state any claim against the Board. (Dkt. 65.) McKay is suing the Board for violation of her Fourth Amendment rights, IIED, and intrusion upon seclusion on the grounds that the Board granted Carbone a disability benefit "to reward Carbone for his actions and silence" in violating McKay's rights. (Dkt. 60 at 44–47.) In response, the Board contends that McKay has failed to allege that the Board was involved or collaborated with the other Defendants in the administration of McKay's drug test or in any other wrongful activity. (Dkt. 65.)

The Court concludes that McKay has not provided any factual allegations to make her claims against the Board plausible. McKay's claims against the Board are all based on her argument that the Board is complicit in the discrimination, retaliation, invasion of privacy, and emotional distress she faced because it rewarded Carbone with a disability pension. The Court finds, however, that McKay's theory of the Board's liability is speculative for several reasons.

First, McKay does not allege that the Board participated in the events underlying her constitutional and state law claims. Rather, McKay alleges that many of the Board's Trustees are or were CFD employees and the Board's purpose is to administer benefits to CFD employees and their families. (Dkt. 60 at 44–46.) It is not reasonable to infer from the Board's composition and (statutory) purpose alone that the Board was attempting to reward Carbone or give him a pass for causing harm to McKay. If that were the case, then it is hard to imagine what kinds of personnel affiliated with the CFD would not be complicit in the alleged conspiracy against McKay.

Additionally, McKay makes much of the fact that during Carbone's Occupational Duty Disability Hearing, the Board asked an unusual question and applied an allegedly new standard to the determination of Carbone's disability status. (Dkt. 60 at 47.) McKay is, however, not just challenging the propriety of the Board's grant of disability benefits to Carbone. She is instead attempting to connect this grant to her wrongful drug test and the rest of the Defendants' other allegedly wrongful conduct, thereby implicating the Board in a scheme to violate her rights. This connection is what purportedly makes the Board a proper defendant for this case. But absent any factual allegations that would make it reasonable to infer that this change of procedure was done so that the Board could reward Carbone for his participation in McKay's drug test, the discrimination McKay has faced, or any other action taken against McKay, the disability hearing is irrelevant. Even if the hearing and the determination that Carbone should get a disability pension were incorrect, McKay has failed to plausibly thread the needle.

Finally, to the extent that the timing of Carbone's disability application appears suspicious to McKay, a review of the disability hearing transcript that McKay attached to her SAC shows that Carbone suffered from a heart attack on February 6, 2019, days after McKay's drug test. (Dkt. 60 at 235, 16.) This fact renders McKay's wild claims even more speculative as Carbone suffered

from a major health event that clearly warranted a disability application. While a plaintiff need not dispel other inferences at the motion to dismiss stage, McKay has not offered factual allegations to make her claims against the Board plausible.

The Court therefore grants the Board's motion to dismiss McKay's constitutional and state law claims against it. Considering the dearth of factual allegations to suggest that the Board was in any way involved in this matter, the Court finds that amendment of the SAC would be futile. McKay's constitutional and state law claims against the Board are thus dismissed with prejudice.

### Conclusion

For the foregoing reasons, the City and the Individual Defendants' motion to dismiss McKay's SAC is granted in part and denied in part. McKay's Title VII retaliation claim against the City may proceed. McKay's Title VII sex, race, and national origin discrimination claims, § 1983 claims against the City, IIED, and intrusion upon seclusion claims are dismissed without prejudice. McKay's § 1983 individual capacity and conspiracy claims against the Individual Defendants are dismissed with prejudice.  The Court also grants the City's motion to strike McKay's prayer for punitive damages for her Title VII claim. Lastly, the Court grants the Board's motion to dismiss McKay's § 1983, IIED, and intrusion upon seclusion claims; all of McKay's claims against the Board are dismissed with prejudice. By August 5, 2024, the parties should submit a joint status report, proposing a case management schedule for the remaining claim. If McKay believes in good faith that she can cure the deficiencies noted herein, she may amend her complaint for the third time by July 29, 2024.

Dated:  7/1/24

_Nancy L. Maldonado_
_____
Honorable Nancy L. Maldonado
U.S. District Judge