**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LEE ANN MCKAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **No. 21 C 00577** |
| ) | |
| **CITY OF CHICAGO,** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lee Ann McKay has been employed by the Chicago Fire Department ("CFD")

since 1999. At various points in her career, McKay was stationed at firehouses without separate

restroom or locker room facilities for female firefighters. McKay contends that after she filed a

complaint in 2016 with the Equal Employment Opportunity Commission ("EEOC") complaining of

the lack of women's restrooms, the City retaliated in a host of ways over the next eight years.

She has filed three additional EEOC charges, and now brings this *pro se* lawsuit under Title VII

of the Civil Rights Act of 1964, asserting claims of sex discrimination, race discrimination, and

retaliation, as well as two state tort claims under Illinois law. The City has moved for summary

judgment [194] on all counts; as explained herein, that motion is granted in that all federal claims

are dismissed, and the court relinquishes jurisdiction over state law claims.

**BACKGROUND**

The facts summarized below are taken from the parties' respective Local Rule 56.1

statements.[1] As required at this stage, the court takes disputed facts in the light most favorable

to the non-moving party, but will not draw inferences "that are supported by only speculation or

---

[1]     Defendants' Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [196] ¶ ___." McKay's Response to Defendant's Local Rule 56.1 Statement is cited here as "Pl.'s Resp. [202] ¶ ___." McKay has also submitted an Additional Statement of Facts, cited here as "PSOF [201] ¶ ___." Defendants' Response to McKay Additional Statement of Facts is cited here as "Defs.' Resp. [208] ¶ ___."

conjecture." *In re Greenpoint Tactical Income Fund LLC,* 168 F.4th 1002, 1007 (7th Cir. 2026) (quoting *Osborn v. JAB Mgmt. Servs.*, Inc., 126 F.4th 1250, 1258 (7th Cir. 2025)). This court assumes the parties' familiarity with two prior written rulings in this case.[2]

## I. Factual Background

### A. Sex Discrimination

Plaintiff McKay has been a member of the Chicago Fire Department since December 1999. (DSOF [196] ¶ 2.) During her lengthy tenure, she has held a variety of positions with CFD; since November 2014, McKay has held the title of "Fire Engineer-EMT." (*Id.*)

McKay's central focus in this lawsuit is on allegedly unequal bathroom and locker room facilities at CFD firehouses. Because CFD firefighters work 24-hour shifts, CFD firehouses have living quarters for firefighters that consist of bathrooms with showers, locker rooms, and sleeping areas. Each fire house also has a public bathroom that consists of a toilet and sink. *See* Second Mot. to Dismiss Order, 2025 WL 2418436, at *2. Historically, the CFD force was predominantly male, and many CFD firehouses lacked separate facilities for female firefighters. Women firefighters were thus required either to share the restroom with their male colleagues, or use the firehouse's public restrooms. McKay claims that she has been stationed at firehouses without private, female-only restrooms at various points during her tenure with CFD. (Pl. Decl. [201] at 18.) She described these facilities as follows:

> Everything was wide open, there were no locks so you – you couldn't change your clothes, you couldn't – you couldn't use the bathroom without being some type of – well, it's wide – I think you get the point. You couldn't take a shower and not be confident that somebody was going to walk in while you're taking a shower.

(Pl. Dep. [196-3] at 39:2–8.) It is not clear whether, in these bathrooms, firefighters had any level of privacy by way of curtains or stalls, or were instead expected to use the facilities in full view of other firefighters.

---

[2] *See* First Mot. to Dismiss Order, 2024 WL 3251349 (N.D. Ill. July 1, 2024) (Maldonado, J.); Second Mot. to Dismiss Order, 2025 WL 2418436 (N.D. Ill. Aug. 20, 2025) (Pallmeyer, J.).

McKay's summary judgment materials include numerous other complaints about the conditions of the restrooms in CFD firehouses during her tenure. Some of these incidents occurred decades prior to the filing of this lawsuit—for example, she asserts that in 2001 "a firefighter named Matthews" told her she was not allowed to have a bowel movement at the firehouse, because the restroom for women was located close to the kitchen. (DSOF [196] ¶ 42.) She also claims that around 2003, a CFD District Chief halted the construction of a women's restroom and locker room because he preferred that a weight room be installed instead. (*Id.* ¶ 107.) These conditions are obviously unacceptable, and McKay's continued frustration is understandable, but it is important to note that these circumstances existed more than 20 years ago.[3]

McKay has a variety of other complaints about restrooms in CFD firehouses, but in many instances, she has identified no dates at all when the conditions she complains of existed, leaving the court guessing about exactly when McKay was forced to use the allegedly deficient restrooms. It is possible—even likely, considering that CFD has spent the last decade renovating firehouses to include female facilities—that these incidents also occurred many years ago. From what the court can determine, there is record evidence of just two instances of bathroom-related treatment that occurred within the *decade* prior to the filing of this lawsuit. The first occurred on September 21, 2015, when McKay claims she was prohibited (she does not say by whom) from using a bathroom she shared with another firefighter (evidently because she is a woman), and was instead forced to use the firehouse's public bathroom. (DSOF [196] ¶ 44.) The second occurred on January 27, 2020, when CFD issued "General Order Addendum 17-014A" that McKay claims was discriminatory towards her—the contents of this General Order are not clear from the record,

---

[3] In Illinois, Title VII plaintiffs must exhaust their remedies by filing a complaint with the EEOC within 300 days of the allegedly discriminatory incident. 42 U.S.C. § 2000e–5(e); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). Because McKay's first EEOC charge was filed on February 29, 2016 (Second Amended Compl. [60] at 115), any events that occurred prior to May 5, 2015 are barred as untimely.

however, nor has McKay explained what led her to believe it was intended to discriminate against her. (*Id.* ¶ 75.)

As noted, the City claims it has updated many of its firehouses to include "equal access improvements," including (presumably) women's restrooms and locker rooms. It is not entirely clear where (or when) these upgrades took place, but McKay asserts that the women's facilities remain deficient to this day. She notes that the showers in the female restrooms use "low flow shower heads" that make them more difficult to use, and that female restrooms "lack access to speakers and bells" that alert firefighters to an emergency call. (Pl. Decl. [201] at 24.)

On February 29, 2016, Ms. McKay filed a complaint ("the February 2016 Charge") with the EEOC alleging that the CFD bathroom situation amounted to sex-based discrimination. In the complaint, she charged:

> During my employment, I and a class of female employees have been subjected to different terms and conditions of employment. Firefighters and paramedics generally work a shift of 24 hours or more; consequently, our jobs require us to sleep, shower (locker room facilities) and use the restroom facilities (collectively, the "Facilities") at the various firehouses in the City of Chiago. Many firehouses do not have separate Facilities for men and women, and at others, the Facilities for women are unequal or not equally accessible to those available to the men. The Disparities in the facilities also discourage other women from applying to work as City of Chicago firefighters and paramedics.

(Second Amended Compl. [60] at 115.)

### B.   Retaliation

McKay claims that her CFD colleagues retaliated against her many times in response to her filing of the February 2016 Charge. She describes several of these incidents in a second complaint filed with the EEOC on February 8, 2017 ("the February 2017 Charge"), and she later elaborated on them during her deposition. The court briefly recounts these accusations in the bullets below, observing that McKay is frequently vague and unclear when describing them:

- She claims that the City assigned Jesse Chavez and Lone Williams "to my shift to spy on and harass me," but does not explain who at the City was responsible, or how the person[s] who directed the espionage were aware of her protected activity. (Pl.'s Resp. [202] ¶ 18.) She also does not explain how Chavez and Williams spied on her. While she does allege that Chavez falsely accused her of making "racially inappropriate comments," she does not

4

provide any basis for a finding that Chavez's accusation was a response to her earlier protected activity. (*See* Pl. Dep. [196-3] at 102:10–15.)

- McKay notes that Mr. Chavez "direct[ed] traffic to drive . . . in a hazardous manner" while she was driving the fire engine. She explained that she was driving in downtown Chicago, and Chavez would use the "air horn" and PA system on the vehicle to direct traffic into her lane, putting her at risk of an accident. (Pl. Dep. [196-3] at 103:22–104:22.) She does not explain why Chavez was willing to engage in conduct that presumably would have placed himself in danger. Nor does she identify any evidence linking Chavez's dangerous traffic direction with her Title VII protected activity.

- According to McKay, she was transferred to Engine 98, a less desirable assignment, in retaliation for her protected activity. She does not say when this transfer occurred. And because she does not know who assigned her to Engine 98, she also does not know whether that person knew of her protected activity. (DSOF [196] ¶ 20; *see also* Pl.'s Resp. [202] ¶ 20.)

- McKay claims she was summoned to "district and headquarters" to participate in "investigations," but does not explain who summoned her, for what reason she was investigated, or when this incident occurred. (DSOF [196] ¶ 21.)

- While she was stationed at the Engine 1 firehouse, she complained to CFD leadership about the "deplorable mattresses and the 'prison cell' for women's quarters." (Pl.'s Resp. [202] ¶ 9.) The firehouse then received new mattresses, but the extra bed in the women's bedroom was inexplicably removed. (Pl. Dep. [196-3] at 110:11–111:7.) The person who removed the bed is not identified in the record. (*See id.*) She speculates this was retaliatory, but again provides no facts or information in support. (DSOF [196] ¶ 22.)

- McKay complains that CFD retaliated against her by placing inflammatory signs on the doors of women's bathrooms. She explained that men at firehouses would often use women's restrooms, and that she believed a sign instructing men not to use the restroom was put in place in response to her EEOC charge complaining of the same. How such a sign would be viewed as adverse is unclear to the court; but McKay contends that CFD chose to use a sign versus other forms of notification (such as a memorandum) deliberately to lead her male coworkers to believe that female firefighters received special treatment. (Pl. Dep. [196-3] at 115:5–116:20, DSOF [196] ¶ 23, Pl.'s Resp. [202] ¶ 23.)

- She complains that Battalion Chief Weilgat and Deputy Fire Commissioner Helmold told her she did not "know how to do [her] job." (Pl. Dep. [196-3] at 121:6–15.) It is not clear what prompted this conversation, but McKay appears to believe it was in retaliation for her requesting a transfer to another firehouse because she allegedly did not know how to back the fire engine into a firehouse's garage. (*Id.* at 121:22–122:1.) She claims two other individuals witnessed this altercation with Weilcat and Helmold, but statements from those individuals are not in the record. (*Id.*) She also does not provide a date this interaction occurred, stating only that it was the "workday before I was there." (*Id.* at 120:18.)

(February 2017 Charge [60] at 118.) As noted, while she claims these incidents were retaliatory,

she identifies little to no evidence (aside from her own speculation) that the City and its agents

acted with retaliatory animus.

5

But the incidents mentioned in the February 2017 Charge are not the only allegedly retaliatory incidents at issue in this case: her deposition testimony references numerous other incidents of retaliation over the course of an eight-year period stretching from 2016 through 2024. These allegations are recounted (in detail) in 52 numbered paragraphs in the City's LR 56.1 statement of facts. (DSOF [196] ¶¶ 42–96.) For the sake of brevity, the court will not recite each of those allegations here. But broadly speaking, she alleges that she (1) was forced to attend punitive training sessions (*id.* ¶¶ 45–47); (2) was given less favorable work assignments (*id.* ¶¶ 48, 64, 65, 67, 74); (3) was not paid overtime in a timely fashion (*id.* ¶ 50); (4) was accused of damaging property, harassment, and making racist comments (*id.* ¶¶ 51, 55); (5) was subjected to disciplinary investigations (*id.* ¶¶ 57, 60, 63, 66, 81); (6) was treated poorly by coworkers (*id.* ¶¶ 52, 62); and (7) had various items stolen at firehouses (*id.* ¶¶ 76, 77, 80).

McKay was asked during her deposition to provide additional details on each of these incidents—including who was responsible, whether the involved individual knew of her protected activity, and why the responsible individual behaved as they did—but McKay repeatedly refused to provide even this basic information. For example, when asked to provide details about her allegation that CFD forced her to attend training sessions in retaliation for her protected activities, she could only speculate:

> **Q:** Are you claiming that by being sent to retraining, you were being retaliated against for your protected activities?
>
> **A:** Yes.
>
> **Q:** Which protected activities were you being retaliated against for?
>
> **A:** Once again, I don't know what their reasoning was or what's in their head or what they – but we had – we're in the middle of litigation and we had EEOC complaints and complaints with the IG, complaints with the EEO, and with internal affairs.
>
> **Q:** Who were the individuals retaliating against you?
>
> **A:** I don't know, once again.
>
> **Q:** How do you know that the people who were retaliating against you were aware of your protected activities?
>
> **A:** Because it was common knowledge in the Chicago Fire Department.

6

**Q**: How do you know that?

**A:** Because I was a reliever who went to different houses and everybody knew.[4]

(Pl. Dep. [196-3] at 169:13–170:11.)  This snippet from her deposition is pure speculation—and it is not isolated.  Much of her deposition testimony is similarly vague, speculative, and conjectural.

Overall, her summary judgment materials are just as confusing.  Since she identifies no additional evidentiary support for the vast majority of her accusations, her murky deposition testimony is left as the only support for most of her claims.  Beyond the deposition testimony, McKay has also submitted a Declaration describing allegedly unfair and retaliatory discipline: Specifically, she claims that she was (1) falsely accused of hitting an Escalade with a fire truck in June 2015, (2) disciplined for a social media post, (3) "charged with violence in the workplace" for the use of profanity; (4) disciplined for a uniform infraction in 2018; (5) drug tested in 2019; (6) was accused of sexual harassment and violence in the workplace in 2023; (7) and "accused and disciplined for violence in the workplace in 2022 for using the word mincemeat in a debate." (Pl. Decl. [201] at 20–21.)  The Declaration provides little additional evidentiary support for her claim of retaliation.  Aside from the Escalade incident—which she denies—McKay does not clearly state whether or not she actually did the things she was accused of doing.  And, again, she does not state who was responsible for disciplining her, whether that individual knew of her protected activity, or why she believes the discipline was a pretext for retaliation.

### C. Race Discrimination

Next, McKay, who is white, claims that the City discriminated against her on the basis of race by favoring African American and Hispanic candidates in promotion decisions.  In 2009, Ms. McKay took CFD's promotion examination; based on her score, she was placed number 406 in line for promotion to Lieutenant.  (DSOF [196] ¶ 27.)  But she was not offered a promotion for

---

[4]    At CFD, a "reliever" is a firefighter that rotates between different houses within a fire district.  (Pl. Dep. [196-3] at 23:22–24:13, 41:8–22.)

eight years, and several lower-scoring candidates of minority races were promoted ahead of her. (*Id.* ¶¶ 26–27.) Both parties acknowledge that the City was required to have a policy in place favoring racial minorities in promotion decisions by a consent decree in *United States v. Albrecht*, 80 C 1590 (N.D. Ill. 1980),[5] and that the individuals promoted ahead of McKay were chosen due to "banding" required by *Albrecht*. (DSOF [196] ¶ 28; Pl.'s Resp. [202] ¶ 28 (undisputed in relevant part).) McKay nevertheless asserts that the City's failure to promote her constituted race-based discrimination in violation of Title VII.

Finally, in January 2017, McKay was offered a promotion to Lieutenant, but she turned it down. According to her deposition testimony, she waived the promotion because she was afraid that she would be subject to additional retaliation if she were to accept. (DSOF [196] ¶ 28 (quoting Pl. Dep. [196-3] at 126:17–22; 137:1–21).) In June 2017, she was offered the promotion again, and declined once more. (*Id.*)

On July 5, 2017, McKay filed a third EEOC charge ("the July 2017 EEOC Charge"), complaining that the City's delay in promoting her constituted race-based discrimination. (*Id.* ¶ 26.) McKay was subsequently offered a promotion on two other occasions, in April 2018 and December 2018, but declined those promotions as well.

## D. Discriminatory Drug and Alcohol Testing

On February 2, 2019, McKay was forced to take an involuntary drug test to "ascertain [her] fitness for duty." (DSOF [196] ¶ 30; PSOF, Ex. 1 [201] at 21, ¶ 65.) At the time of the test, McKay was "not informed why [she] was being drug tested, not provided any paperwork, not allowed to take any photographs of the paperwork," and was not told who ordered the test.[6] (PSOF, Ex. 1

---

[5] The United States and the City of Chicago later jointly moved to terminate the *Albrecht* consent decree. On June 16, 2022, this court granted that motion in a separate case. (*See* Order Granting Joint Motion to Dissolve [81] in *Albrecht*, 80 C 01590 (Pallmeyer, C.J.).)

[6] The City has now confirmed the test was ordered by Defendant Michael Carbone, a CFD Battalion Chief. (DSOF [196] ¶ 30.) It remains unclear, however, why Carbone ordered the test. (*See id.*)

[201] at 21, ¶ 65.)  McKay tested negative for both drugs and alcohol but—for reasons that the City does not explain—she was nonetheless relieved of duty for the day and involuntarily driven home.  (DSOF [196] ¶ 30; PSOF, Ex. 1 [201] at 22, ¶¶ 67–72.)  McKay claims that the decision to relieve her of duty carried the connotation that she had tested positive, sparking gossip among her co-workers.  (Pl. Decl. [201] at 21–22, ¶ 66.)  While she claims that this test was ordered in retaliation for her past EEOC complaints, she does not explain why she believes that to be the case.  (*See* Pl. Dep. [196-3] at 141:10–11 ("I don't know why they drug tested me.").)

On November 21, 2019, McKay filed a fourth EEOC complaint (the "November 2019 EEOC Charge"), charging that the drug and alcohol testing was retaliatory.  (Pl. Dep. Ex. I [196-3] at 130.)

## II.    Procedural History

This lawsuit resulted.[7]  On January 28, 2021, with her EEOC charges still pending, McKay filed a *pro se* Complaint [1] against the City and a number of CFD employees pursuant to 42 U.S.C. § 1983, asserting (1) that the defendants had violated the Fourth and Fourteenth Amendments to the U.S. Constitution, and (2) incurred liability under Illinois tort law.  (Compl. [1]

---

[7]    This is not McKay's first lawsuit against the City.  On December 30, 2014, Plaintiff filed a *pro se* complaint against the City in this District—*McKay v. City of Chicago* ("*McKay I*"), 14 C 10446—alleging discrimination and retaliation in violation of Title VII.  (DSOF [196] ¶ 33.)  In that case, McKay claimed that she reported a supervisor's sexist comments, and that the City retaliated against her by denying medical care, subjecting her to disciplinary proceedings premised on false accusations, harassing her by conducting "well-being checks" while she was on medical leave, transferring her to a less-desirable firehouse, and delaying overtime and holiday pay.  *McKay v. City of Chicago*, No. 14 CV 10446, 2022 WL 21362792 (N.D. Ill. Jan. 25, 2022) (Tharp, J.).  In 2022, Judge Tharp of this court granted summary judgment in favor of the City, remarking that McKay's "litany of complaints . . . concern petty slights and trifles," and thus were not actionable under Title VII.  *Id.* at *4.  McKay appealed, and the Seventh Circuit affirmed in an unpublished order.  *McKay v. City of Chicago*, No. 22-1251, 2023 WL 1519525 (7th Cir. Feb. 10, 2023).

On May 23, 2024, McKay sued Judge Tharp's court reporter, accusing the court reporter of omitting portions of a hearing transcript in *McKay I*.  On September 16, 2025, Judge Coleman of this court granted the court reporter's motion for summary judgment.  *McKay v. A&F Reporting, Inc.*, No. 24 CV 4249, 2025 WL 2654163 (N.D. Ill. Sept. 16, 2025) (Coleman, J.).

at 18–22.)  Judge Kocoras of this court stayed the case [24] pending the outcome of her EEOC charges.

On January 4, 2022, the EEOC declined to pursue the case but issued a right-to-sue letter on all four EEOC charges.  (DSOF [196] ¶ 32.)  McKay has amended her complaint twice [31, 60] to add claims under Title VII.  In 2024, Judge Maldonado (then of this court) dismissed many of McKay's claims on motion, observing that she had not alleged discriminatory practices at firehouses where she herself had worked, and did not plausibly allege disparate treatment affecting her personally.  *See* First Motion to Dismiss Order [89], 2024 WL 3251349 (N.D. Ill. July 1, 2024).

Following Judge Maldonado's elevation to the Court of Appeals, the case was reassigned [90] pursuant to Local Rule 40.1(f).  Ms. McKay then filed a Third Amended Complaint [101], and this court dismissed McKay's constitutional claims on motion.  *See* Second Motion to Dismiss Order [166], 2025 WL 2418436 (N.D. Ill. Aug. 20, 2025).  The remaining operative claims are (1) Title VII retaliation, Title VII sex-based discrimination, and Title VII race-based discrimination, and (2) Illinois law intentional infliction of emotional distress, and Illinois law intrusion upon seclusion.  *See id.*

The City moved [194] for summary judgment, and served McKay with a Local Rule 56.2 notice informing her of her obligations with respect to summary judgment practice in this District.  McKay responded by filing a Local Rule 56.1(b)(3) Statement of Additional Material Facts and a Local Rule 56.1(b)(2) Response to Defendant's Statement of Facts, but she has not filed a memorandum of law, and the materials that she did submit ignore the City's legal arguments.  The City has filed a Reply Brief [207], and the motion is now fully briefed.

## **LEGAL STANDARD**

Summary judgment is appropriate if "'there is no genuine dispute as to any material fact,' and the moving party 'is entitled to judgment as a matter of law.' " *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026) (quoting FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477

10

U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, the court construes "the facts in the light most favorable" to the non-moving party and draws "all reasonable inferences in its favor." *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025). It does not "weigh evidence or make credibility determinations." *Johnson*, 164 F.4th at 1079.

Summary judgment is the "put up or shut up moment in litigation" where "the non-moving party is required to marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (citation and internal quotation marks omitted). The opposing party must produce *affirmative* evidence showing there is more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Speculation and conjecture "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) (citing *Circle City Broad. I, LLC v. AT&T Servs., Inc.*, 99 F.4th 378, 384 (7th Cir. 2024)).

## DISCUSSION

As noted above, McKay was notified of this court's requirements for opposing summary judgment in a notice filed on the public docket [198], but nonetheless failed to file the memorandum of law required by Local Rule 56.1(b)(1). The City asks the court to grant summary judgment in its favor for this reason alone (Reply [207] at 1), but the court declines that invitation. Because Ms. McKay is *pro se*, the court will excuse her non-compliance with local rules and endeavor to address the pending motion based on the (limited) factual evidence she identifies in the materials that she did submit. *See Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013) ("[W]e have repeatedly held that the district court has broad

11

discretion to require strict compliance with local rules or to relax the rules and excuse noncompliance.").

The court will not, however, "dig through the record to find evidentiary support for a party's summary judgment arguments." *MAO-MSO Recovery II, LLC v. State Farm*, 994 F.3d 869, 876 (7th Cir. 2021). As the Seventh Circuit has explained, the "party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 713 (7th Cir. 2021); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414–15 (7th Cir. 2019) (reiterating that each litigant has an obligation to bring evidence "to the court's attention"). While *pro se* litigants like McKay are entitled to liberal construction of their filings, they do not enjoy a lessened evidentiary burden at summary judgment. *See Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) ("[A plaintiff's] pro se status doesn't alleviate his burden on summary judgment." (citation omitted)).

Accordingly, the court will consider only the legal and factual arguments raised in McKay's summary judgment filings, construed liberally. All other potential arguments are waived. *See Crothersville Lighthouse Tabernacle Church, Inc. v. Church Mut. Ins. Co., S.I.*, 168 F.4th 483, 490–92 (7th Cir. 2026); *see also Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

**I.     Title VII Discrimination**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, makes it unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." To survive summary judgment on her discrimination claims, Ms. McKay "must produce evidence that would let a reasonable factfinder find" that her membership in a protected class "caused an adverse

employment action." *See Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025); *see also Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025). McKay claims that CFD discriminated against her on two bases: race and sex. As explained below, the record does not reveal disputes of material fact on either theory.

First, McKay appears to argue that the City's policy of advantaging members of minority races in making promotion decisions constitutes discrimination on the basis of race. (*See* DSOF [196] ¶¶ 25–28; Pl. Resp. to DSOF [202] ¶¶ 25–28.) The problem with this claim is that the city has offered a lawful justification for its actions: the *Albrecht* consent decree. As the City explains, a consent decree entered into between the United States and the City of Chicago in the case *United States v. Albrecht*, 80 C 1590 (N.D. Ill. March 31, 1980), required the use of limited racial preferences in promotion decisions at the Chicago Fire Department. McKay does not dispute that the consent decree was in place at the time the promotion decisions at issue were made, or that those individuals promoted before her were promoted due to the consent decree.[8] (*See* DSOF [196] ¶¶ 25–28; Pl. Resp. to DSOF [202] ¶¶ 25–28.) Since she has offered no alternative basis to hold the City liable under Title VII for its compliance with *Albrecht*,[9] summary judgment is warranted on her race discrimination claim.

---

[8] The court observes that McKay was eventually offered the promotion more than once, but the offers down out of fear of retaliation. While that fact alone does not prevent her from recovering under Title VII, the court notes that her lost pay damages would likely be capped based on the date that she first declined the promotion. *Cf. Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1203 (7th Cir. 1989) (accrual of damages for a discriminatory employment action terminates where the plaintiff unreasonably rejects an offer of reinstatement).

[9] It is not at all clear that she could. Title VII plaintiffs can bring claims under either a disparate treatment or disparate impact theory—because remedying disparate impact on one race often requires disadvantaging members of another, the interplay between these two theories has been the subject of intense litigation. Ultimately, the Supreme Court settled the matter in the case *Ricci v. DeStefano*, 557 U.S. 557 (2009). In *Ricci*, the New Haven, Connecticut, fire department held an exam to determine which firefighters were eligible for promotions. No African American candidate qualified. So, New Haven faced a difficult choice: it could either (1) discard the results of the examination, sparking a disparate-treatment lawsuit from the exam's top performers; or (2) retain the results, potentially sparking a disparate-impact lawsuit from African American applicants. Ultimately, Supreme Court held that a municipality can defend against a disparate-treatment lawsuit if it can show there was a "strong basis in evidence" that failing to take

Second, McKay asserts that the City's failure to provide appropriate gendered restrooms at CFD firehouses constitutes discrimination on the basis of her sex. While the record includes numerous complaints about the state of firehouse restrooms during McKay's two decades at CFD, as noted above, most of these allegations are not dated and appear to be untimely. *See Bass*, 746 F.3d at 839. Regardless, McKay's summary judgment materials only identify two facts that she supports her case; neither are persuasive.

She first cites to an affidavit submitted by Marek Wisniewski, Deputy Commissioner of the City's Department of Fleet and Facility Management, who states as of January 9, 2026, only 32 out of 96 total firehouses in Chicago have dedicated women's facilities. (PSOF [201] ¶ 12; *see also* Wisniewski Decl. [196-8].) The court presumes Plaintiff contends that the lack of a bathroom available only to women is a violation of Title VII. But the lack of a gendered bathroom, without more, is not discriminatory. There is no indication that women were not allowed to use *any* restroom, only that the firehouse did not have a women-only restroom on site. Ms. McKay was not being treated differently because of her sex simply because she was asked to share a gender-neutral restroom with her male colleagues. McKay might be able to proceed to trial on a hostile work environment theory if she could show that she was regularly forced to use the toilet or shower in view of her male colleagues, for example, or if the situation in the restrooms led to sexual harassment by coworkers. But McKay identifies no evidence of that, or anything else that could support a jury finding that her use of a bathroom that was also used by male firefighters created a hostile work environment. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018)

---

the challenged action would lead to disparate-impact liability. *See id.* ("We conclude that race-based action like the City's in this case is impermissible under Title VII unless the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute.").

Here, the disparate treatment at issue was sparked by the entry of a consent decree, which the court assumes would provide the "strong basis in evidence" necessary to escape Title VII liability. *Cf. United States v. Brennan*, 650 F.3d 65, 72 (2d Cir. 2011) (exploring tension between a proposed consent decree and *Ricci*).

(observing that a plaintiff asserting a hostile work environment claim must show the "conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment").

McKay next submits her own affidavit, in which she asserts that the women's facilities are unequal to men's facilities because the former use "low flow shower heads" and "lack access to speakers and bells." (PSOF [201] ¶¶ 79, 80.)   But any moderate shortcomings in the restrooms that do exist do not give rise to liability under Title VII.  "[R]outine workplace difficulties" and "petty slights or minor annoyances" are not cognizable under federal anti-discrimination law, even under a hostile work environment theory.[10]  *See McKay I,* 2022 WL 21362792, at *5 & *7 (citation and internal quotation marks omitted); *see also Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) ("Title VII does not set forth a general civility code for the American workplace" (cleaned up)).  Perhaps the lack of absence of speakers and bells in women's restrooms makes it more difficult for female firefighters to respond to calls; but McKay identifies no evidence that she herself was delayed in responding to a call for this reason, let alone that she suffered any discipline as a result.  (*See* DSOF [196] ¶¶ 91–93 (undisputed).)  There are simply no facts in the record of difficulties severe enough to constitute a violation of federal employment law.

Summary judgment is granted on the Title VII discrimination claims.

## II.      Title VII Retaliation

McKay also brings a Title VII retaliation claim.  In addition to prohibiting discrimination, Title VII also makes it unlawful for an employer to retaliate against an employee for engaging in protected activity.  42 U.S.C. § 2000e-3(a); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  To survive summary judgment on this claim, McKay must offer sufficient

---

[10]      The court notes that "low flow" shower heads are relatively recent innovations aimed at conservation and protection of the environment, and that the presence of these shower heads in the womens' restroom at firehouses may well be a function of the fact that those restrooms are newer ones.  McKay presents no evidence that the City deliberately installed deficient showerheads in the womens' bathrooms to discriminate against women.

evidence from which a jury could conclude that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the two. *Est. of Harris v. City of Milwaukee*, 141 F.4th 858, 869 (7th Cir. 2025). Protected activity can include opposing any unlawful employment practice, as well as making a EEOC charge, testifying, or otherwise participating in an investigation into an unlawful employment practice. *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 274 (2009). An adverse action is one that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (citation and internal quotation marks omitted).

McKay contends that the City retaliated against her in numerous ways. She notes the City's (1) investigating her for hitting a vehicle with a fire truck in 2015; (2) punishing her for violations of CFD's social media policies, (2) disciplining her for the use of profanity at work and for not being in uniform, (3) forcing her to take a drug test, and (4) investigating her for "sexual harassment and violence in the workplace." (PSOF [202] ¶¶ 55–64 (describing instances of "targeted discipline").) Assuming these incidents are actionable under the relevant standard, *cf. Est. of Harris*, 141 F.4th at 869 ("an action in the [Title VII] retaliation context must be materially adverse, meaning that it causes 'significant' harm"), they are not sufficient to withstand summary judgment because McKay has presented no evidence of causation. To advance to trial on a retaliation claim, a plaintiff must "be able to show that the protected activity was a 'but for' cause for the adverse action, meaning 'the adverse action would not have happened without the activity.' " *Kedas v. Ill. Dep't of Transp.*, 149 F.4th 951, 958 (7th Cir. 2025) (quoting *Johnson v. Accenture LLP*, 142 F.4th 536, 543 (7th Cir. 2025)). The listed incidents were surely unpleasant, but McKay identifies no evidence supporting a jury inference that any of them were caused by her prior protected activity. She does not even contend that she did not engage in the conduct for which she was disciplined and investigated.

16

To be sure, smoking gun evidence is not necessary; because discriminatory employers are rarely forthright about their true motivations, McKay can survive summary judgment through circumstantial evidence. *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 892 (7th Cir. 2024) (listing "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual" as examples). But McKay has not identified such circumstantial evidence. Her materials do not support an inference that the investigations were pretextual, that fellow employees were treated differently, or that there is even a remote basis for a finding that her supervisors sought to punish her for protected activity. To the contrary, the only evidence she offers in support of the vast majority of her claims is her own deposition testimony. But, as explained above, that testimony consists largely of speculation—she repeatedly refused to provide even the most basic details about her claims, despite being given many opportunities to do so.[11] Most notably, she failed to identify any evidence that those responsible for the mistreatment even knew of her protected activity, an omission that is fatal to retaliation claims. *See Anderson v. Street*, 104 F.4th 646, 655 (7th Cir. 2024) ("The decisionmaker . . . must be aware of the protected activity to establish a causal connection."); *see also King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (same).

Speculation about supervisors' motives is not enough to advance to trial. *See Bass v. Joliet Public Sch. Dist. No. 86,* 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."); *Kuhn v. United Airlines,* 63 F. Supp. 3d 796, 805 (N.D. Ill. 2014) (Ellis, J.) ("[M]ere speculation about . . . supervisors' awareness is not sufficient to

---

[11] (*See, e.g.*, Pl. Dep. [196-3] at 102:10–21 ("I don't have anything in writing, no . . . I don't recall exactly. I'd have to look at the information again."); 103:4–5 ("Yeah, I don't recall at this time. I'd have to look at – at the documents again."); 105:15–16 ("I don't know why he did it. All I know is he did it."); 103:18 ("Yeah, I don't recall"); 110:2–7 ("I don't even know who summoned me, so obviously no."); 112: 7–11 ("I could speculate. I don't know why they would have, except to create a hostile work environment.").) Of course, the fact that Plaintiff could not recall the details of her allegations on the spot during a deposition is not necessarily fatal to her claim. She may prove her case via other means, so long as she puts forth evidence supplying the critical details of *who* took adverse action against her, and *why* they did so. But Plaintiff identifies no such evidence.

survive summary judgment."). Summary judgment is granted on McKay's Title VII retaliation claim.

### III. Remaining State Law Claims

Finally, the court turns to McKay's allegation that the City required her to undergo drug testing and then, despite negative results, has placed her on leave status. The court has already noted why the drug test does not support a Title VII claim. The City's unexplained decision to place McKay on leave for many months is troubling, but her related tort claims arise under state law.[12] With all federal law claims dismissed from this case, the court relinquishes supplemental jurisdiction over the remaining state law claims without prejudice to renewal in state court. *See* 28 U.S.C. § 1367(c)(3); *see also Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." (quotation marks omitted)).

### <u>CONCLUSION</u>

Defendant's motion for summary judgment [194] is granted. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

ENTER:

Dated: April 20, 2026

REBECCA R. PALLMEYER
United States District Judge

---

[12] The court takes notice that McKay has challenged the conduct of the City and its agents in requiring that she be tested and placed on leave in two more recent federal lawsuits, *McKay v. Patino*, No. 25 CV 679 (dismissed March 27, 2026); *McKay v. City of Chicago*, No. 26 CV 04235 (filed April 16, 2026). The court expresses no opinion on the merits of those cases.